UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION            :
CORPORATION,                              :
                      Plaintiff,          :
                                          :
        – against –                       :
                                          :        Adv. Pro. No. 08-01789 (SMB)
BERNARD L. MADOFF INVESTMENT              :        SIPA LIQUIDATION
SECURITIES LLC,                           :        (Substantively Consolidated)
                      Defendant.          :
------------------------------------------------------------X
In re:                                    :
                                          :
BERNARD L. MADOFF,                        :
                                          :
                                          :
                      Debtor.             :
------------------------------------------------------------X
IRVING H. PICARD, Trustee for the         :
Liquidation of Bernard L. Madoff          :
Investment Securities LLC,                :
                                          :        Adv. Pro. No. 14-02407 (SMB)
                      Plaintiff,          :
                                          :
        – against –                       :
                                          :
A & G GOLDMAN PARTNERSHIP; and            :
PAMELA GOLDMAN                            :
                                          :
                      Defendants.         :
------------------------------------------------------------X
                                          :
CAPITAL GROWTH COMPANY; DECISIONS,        :
INC.; FAVORITE FUNDS; JA PRIMARY          :
LIMITED PARTNERSHIP; JA SPECIAL           :
LIMITED PARTNERSHIP; JAB                  :
PARTNERSHIP; JEMW PARTNERSHIP; JF         :
PARTNERSHIP; JFM INVESTMENT               :
COMPANIES; JLN PARTNERSHIP; JMP           :
LIMITED PARTNERSHIP; JEFFRY M.            :
PICOWER SPECIAL COMPANY; JEFFRY M.        :
PICOWER, P.C.; THE PICOWER                :        Adv. Pro. No. 14-02408 (SMB)
FOUNDATION; THE PICOWER INSTITUTE         :
OF MEDICAL RESEARCH; THE TRUST F/B/O      :

GABRIELLE H. PICOWER; BARBARA          :
PICOWER, individually and as Executor of the  :
Estate of Jeffry M. Picower, and as Trustee for the  :
Picower Foundation and for the Trust f/b/o Gabriel  :
H. Picower,                              :
                                         :
            Plaintiffs,                   :
                                         :
      – against –                         :
                                         :
A & G GOLDMAN PARTNERSHIP; and          :
PAMELA GOLDMAN                           :
                                         :
            Defendants.                   :
-------------------------------------------------------------X

## MEMORANDUM DECISION ENJOINING
## PROSECUTION OF DEFENDANTS' ACTION
## AGAINST THE PICOWER PARTIES

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Deborah H. Renner, Esq.
        Tracy L. Cole, Esq.
        Keith R. Murphy, Esq.
        Amy Vanderwal, Esq.
        Ferve Ozturk, Esq.
                Of Counsel

*Attorneys for Irving H. Picard, Trustee for the
  Substantively Consolidated SIPA Liquidation
  of Bernard L. Madoff Investment Securities
  LLC and the Estate of Bernard L. Madoff*

SCHULTE ROTH ZABEL LLP
919 Third Avenue
New York, NY 10022

        William D. Zabel, Esq.
        Marcy Ressler Harris, Esq.
        Michael Kwon, Esq.
        Jennifer M. Opheim, Esq.
                Of Counsel

2

*Attorneys for the Picower Parties*

HERRICK, FEINSTEIN LLP
Two Park Avenue
New York, New York 10016

>   Joshua J. Angel, Esq.
>   Hanh Huynh, Esq.
>   Of Counsel

>   - and-

BEASLEY HAUSER KRAMER & GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401

>   James W. Beasley, Jr., Esq.
>   Joseph G. Galardi, Esq.
>   Andrew S. Kwan, Esq.
>   Of Counsel

>   - and-

BLACKNER, STONE & ASSOCIATES
123 Australian Avenue
Palm Beach, Florida 33480

>   Richard Lee Stone, Esq.
>   Of Counsel

*Attorneys for A & G Goldman Partnership and Pamela Goldman*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

In January 2011, Irving H. Picard, Esq. ("Trustee"), as trustee of the Securities Investor

Protection Act ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS"), settled the estate's claims against the Picower Parties.[1]  As part of the settlement, the

---

[1]      The "Picower Parties" include Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower; and Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust F/B/O Gabriel H. Picower.

Court entered a permanent injunction in favor of the Picower Parties that barred creditors from asserting claims "duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower Releasees."  Since then, various former BLMIS customers have attempted, without success, to side step the restrictions imposed by the injunction and sue the Picower Parties to recover their lost investments.

The current litigation involves the third such attempt by A & G Goldman Partnership and Pamela Goldman (together, the "Goldman Parties") to sue the Picower Parties in the United States District Court for the Southern District of Florida (the "Florida District Court").  They contend that Jeffry Picower was a "control person" of BLMIS under § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and liable for BLMIS' primary violations of the federal securities laws.

The Trustee and the Picower Parties commenced the above-captioned adversary proceedings to enjoin the Florida litigation contending that it violates the Court's permanent injunction and the automatic stay.  The Picower Parties also seek to prevent the Goldman Parties from filing another complaint against them.  For the reasons that follow, the applications for injunctive relief are granted, but the Picower Parties' request to enjoin the Goldman Parties from filing further pleadings is denied.

## BACKGROUND

The background to these proceedings has been recounted in *A & G Goldman P'ship v. Picard* (*In re BLMIS*), No. 12 Civ. 6109 (RJS), 2013 WL 5511027, at *1-3 (S.D.N.Y. Sept. 30,

4

2013) ("*Goldman I*") and *Picard v. Marshall* (*In re BLMIS*), 511 B.R. 375, 379-386 (Bankr.

S.D.N.Y. 2014) ("*Goldman II*"), *aff'd*, 531 B.R. 345 (S.D.N.Y. 2015).  The Court assumes

familiarity with these decisions and limits the discussion to the facts necessary for the disposition

of the pending applications.

## A.    The Settlement

As recounted in the cited decisions as well as many others, Bernard L. Madoff conducted

the largest Ponzi scheme in history through BLMIS until its collapse and his arrest in December

2008.  The Trustee eventually brought approximately 1,000 adversary proceedings to avoid and

recover the transfers from BLMIS to its customers.  On May 12, 2009, the Trustee sued the

Picower Parties primarily to avoid and recover $6.7 billion that the Picower Parties had

withdrawn from their BLMIS accounts between December 1995 and the collapse of the Ponzi

scheme, and subsequently discovered additional transfers that increased the total withdrawals to

$7.2 billion, *Goldman II*, 511 B.R. at 379-80, of which at least $5 billion represented fictitious

profits consisting of other people's money.  (*Complaint*, dated May 12, 2009 ("*Trustee

Complaint*") at ¶ 2 (Adv. Pro. No. 09-01197 ECF Doc. # 1).)[2]  The *Trustee Complaint* asserted

claims for turnover and preferences under the Bankruptcy Code, fraudulent transfers under New

York and bankruptcy law and disallowance of any Picower Party's claims.  It alleged, among

other things, that the Picower Parties knew or should have known that BLMIS was a Ponzi

---

[2]       A copy of the *Trustee Complaint* is attached as Exhibit 3 to the *Declaration of Marcy Ressler Harris in
Support of the Picower Parties' Application for Enforcement of the Permanent Injunction*, dated Nov. 17, 2014
("*Harris Declaration*") (Adv. Pro. No. 14-02408 ECF Doc. # 4).

scheme, and actively participated by giving directions to BLMIS to create fictitious trading records for their accounts.  (*See, e.g., id.* at ¶¶ 4, 60, 61, 63(f).)

The Trustee, the Picower Parties and the Government, which was negotiating with the Picower Parties regarding a potential civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), eventually entered into a global settlement agreement.  Under the settlement, the Picower Parties agreed to pay $5 billion to the BLMIS estate, corresponding to the amount of fictitious profits they received, (*see Memorandum of Law in Support of Motion for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement by and Between the Trustee and the Picower BLMIS Account Holders and Enjoining Certain Claims*, dated Dec. 17, 2010, at 3 (Adv. Pro. No. 09-01197 ECF Doc. # 25), and to forfeit $2.2 billion to the Government.  *Goldman II*, 511 B.R. at 380.  On January 13, 2011, the Court entered an order approving the settlement agreement between the Trustee and the Picower Parties (the "Settlement Agreement") that included the following permanent injunction (the "Permanent Injunction") in favor of the Picower Parties:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . or anyone whose claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme, is hereby permanently enjoined from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower Releasees . . . .

(*Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement by and Among the Trustee and the Picower BLMIS Account Holders and Issuing a Permanent Injunction*, dated Jan. 13, 2011, at

7 (Adv. Pro. No. 09-01197 ECF Doc. # 43.)  The Trustee agreed in the Settlement Agreement[3] to

use his reasonable best efforts to oppose challenges to the scope, applicability, or enforceability

of the Permanent Injunction.  (Settlement Agreement at ¶ 7.)  Finally, the Picower Parties had

filed twenty-one claims against the SIPA estate, (*see id.*, Attachment A), and they agreed to

withdraw those claims.  (*Id.* at ¶ 9.)

**B.      The Challenge to the Permanent Injunction**

Prior to the settlement, former BLMIS customers (Fox and Marshall) filed putative class

actions against the Picower Parties in the Florida District Court alleging Florida state law claims

sounding in conversion, unjust enrichment, conspiracy, and state RICO violations.  *See Fox v.

Picard* (*In re BLMIS*), 848 F. Supp. 2d 469, 475 (S.D.N.Y. 2012) ("*Fox I*"), *aff'd*, 740 F.3d 81

(2d Cir. 2014) ("*Marshall*").  The Trustee commenced an adversary proceeding to enjoin the

Fox/Marshall actions pending the completion of his settlement with the Picower Parties.  The

Court concluded prior to its approval of the settlement that the Florida actions violated the

automatic stay and at least one stay order of the District Court.  In addition, the Court further

ruled that the Fox/Marshall actions posed an imminent threat to the BLMIS estate and that an

extension of the stay was appropriate and necessary to "preserve the integrity of the SIPA

proceedings and the Trustee's settlement negotiations...."  *Picard v. Fox* (*In re BLMIS*), 429 B.R.

423, 436 (Bankr. S.D.N.Y. 2010), *aff'd*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 81

(2d Cir. 2014).  Finally, the Court stated at the hearing to approve the settlement that the

---

[3]      The Settlement Agreement is attached as Exhibit A to the Court's order.

Permanent Injunction applied to Fox's and Marshall's putative class actions.  (*Transcript of Jan. 13, 2011 Hearing* at 41:8-14) (Adv. Pro. No. 08-01789 ECF Doc. # 3815).)

Fox and Marshall appealed the approval of the settlement and the issuance of the Permanent Injunction, and argued, *inter alia*, that the Court lacked jurisdiction to issue the Permanent Injunction.  District Judge Koeltl, to whom the appeal was assigned, explained that the question hinged on whether the Fox/Marshall complaints alleged direct claims or claims that were derivative of the claims asserted against the Picower Parties by the Trustee.  *Fox I,* 848 F.Supp.2d at 478.

The District Court first observed that the Fox/Marshall complaints made factual allegations which were virtually identical to those made by the Trustee in the *Trustee Complaint* and based on the same conduct by the Picower Parties—"involvement in the Madoff Ponzi scheme, and the transfer of billions of dollars in BLMIS-held customer funds to the Picower [Parties]."  *Id.* at 479.  Furthermore, the alleged wrongful acts harmed every BLMIS investor in the same way, and the claims were "general one[s]" and not claims seeking to recover injury inflicted by the Picower Parties directed toward particular BLMIS customers.  *Id.* at 480 (quoting *St. Paul Fire & Maine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)).  Judge Koeltl rejected the argument that the Florida complaints alleged individualized tort claims rather than the bankruptcy claims alleged in the *Trustee Complaint*, stating that "this nominal difference does not amount to a substantive difference."  *Id* at 481.  He concluded:

> Allowing the Florida Actions to go forward would carry real risks to the estate, implicating the viability of the current settlement and the possibility of future settlements, and providing an avenue for BLMIS customers who are displeased with the Net Equity Decision to undermine that decision by directly pursuing claims that are wholly derivative of claims already brought by the Trustee.

8

*Id.* at 490–91.

Fox and Marshall appealed and the Second Circuit affirmed, concluding that the Fox/Marshall complaints were attempts to "plead around" the Permanent Injunction and the automatic stay. *Marshall*, 740 F.3d at 91–92. The Second Circuit explained that "derivative claims" are claims that arise from the secondary effect of a harm done to the debtor and seek relief from third parties that pushed the debtor into bankruptcy, *id.* at 89; *accord Picard v. JPMorgan Chase & Co.* (*In re BLMIS*), 721 F.3d 54, 70 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2895 (2014); *St. Paul Fire & Marine*, 884 F.2d at 704, while a claim is "particularized" when the injury can be "directly traced to the [third party's] conduct." *Marshall*, 740 F.3d at 89 (quoting *St. Paul Fire & Marine*, 884 F.2d at 704). The Fox/Marshall complaints "allege nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers." *Id.* at 84. They did not contain particularized claims because they "do not allege that the Picower defendants made any such misrepresentations to BLMIS customers." *Id.* at 92. Quoting from District Judge Richard J. Sullivan's decision in a case involving the Goldman Parties and discussed immediately below, the Second Circuit stated:

> The ... Complaints plead nothing more than that the Picower Defendants traded on their *own* BLMIS accounts, knowing that such "trades" were fraudulent, and then withdrew the "proceeds" of such falsified transactions from BLMIS. All the "book entries" and "fraudulent trading records" that the Complaints allege refer to nothing more than the fictitious records BLMIS made, *for the Picower Defendants,* to document these fictitious transactions. In other words, the Complaints plead nothing more than that the Picower Defendants fraudulently withdrew money from BLMIS.

*Id.* (emphasis in original).

9

C.    *Goldman I*

While the Fox/Marshall litigation was wending its way through the courts in this Circuit,

the Goldman Parties sought leave from this Court to file two putative class actions in Florida

District Court.  The proposed complaints alleged that the Picower Parties had received billions of

dollars in transfers under circumstances that suggested they knew that BLMIS was engaged in

fraud.  They claimed that Picower was a "control person" with respect to BLMIS under § 20 of

the Exchange Act, and participated with BLMIS in violations of section 10(b) of the Exchange

Act and Rule 10b–5.  After this Court held that the proposed complaint violated the Permanent

Injunction and the automatic stay, *SIPC v. BLMIS* (*In re BLMIS*)*,* 477 B.R. 351, 355-58 (Bankr.

S.D.N.Y. 2012), *aff'd*, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013), the Goldman Parties

appealed.

On appeal, District Judge Sullivan observed that the same act may give rise to derivative

and direct claims, and claims under § 20(a) of the Exchange Act were direct.  *Goldman I*, 2013

WL 5511027, at *5–6.  However, a plaintiff does not plead a § 20(a) claim simply by labeling it

as such, and the Court must, instead, look to the substance of what is alleged.  *Id*. at *6.  Thus,

although the adequacy of the proposed complaints was not before the District Court, "whether

the Complaints plead a bona fide control person claim *is* relevant insofar as it affects whether

Appellants have pled a non-derivative claim."  *Id*. (emphasis in original).

The District Court then proceeded to examine the proposed complaints and concluded

that they consisted of conclusory averments that did not allege *bona fide* securities fraud claims.

*Id*. at *6-7.  The Goldman Parties did not plead "any facts to support the allegation that the

Picower Defendants controlled BLMIS beyond what was necessarily incident to directing trades

10

in their own customer accounts," and each "conclusory legal statement about the Picower

Defendants' control over BLMIS ... simply parrots the elements required to make out a control

person claim." *Id.* at *8. Furthermore, the proposed complaints did not claim that the Picower

Parties directed BLMIS to make representations beyond what was necessary to document their

withdrawals. *Id.* at *9. The District Court concluded:

> [I]t is not enough that securities fraud claims *would* be non-derivative of
> fraudulent conveyance claims and that Appellants *call* their claims securities
> fraud claims–the Goldman Complaints must *actually* plead securities fraud
> claims. Beyond a few bare legal conclusions, the Complaints plead no such
> claims. All the Goldman Complaints plead is that the Picower Defendants
> directed trades in their own BLMIS accounts and did so knowing that no such
> trades were in fact taking place—in other words, that the Picower Defendants
> fraudulently withdrew money from BLMIS.

*Id.* at *10 (emphases in original).

## D.     *Goldman II*

Three months after the issuance of the decision in *Goldman I*, the Goldman Parties filed

an action in the Florida District Court seeking a declaration that neither the Permanent Injunction

nor the automatic stay barred their new complaint against the Picower Parties which again

alleged a violation of section 20(a) of the Exchange Act. *Goldman II*, 511 B.R. at 386. The new

complaint alleged, in substance, that the Picower Parties "were aware of the Ponzi scheme, were

able to cause BLMIS to make fraudulent entries in their own accounts that allowed them to steal

the funds belonging to other customers, and knew and caused BLMIS to make

misrepresentations to the other customers in the account statements and other financial

information that BLMIS sent to them." *Id.* at 391. The Trustee commenced another suit to

enjoin the new action again arguing that the asserted claims were derivative of the BLMIS

11

estate's claims and barred by the Permanent Injunction and the automatic stay.[4]  The Picower

Parties intervened seeking the same relief as the Trustee.

Addressing the complaints filed or proposed by both the Goldman Parties and the

Fox/Marshall parties, the Court granted the injunction concluding that the new pleadings violated

the Permanent Injunction.  The Court observed that "[a]ll the Courts that have considered the

issue have concluded that regardless of the label the plaintiffs choose to attach to their claims, a

claim based on the Picower Defendants' fraudulent withdrawals and fraudulent entries in their

accounts, without any particularized allegations that the Picower Defendants directly participated

in any misrepresentation to the customers, is derivative of the Trustee's fraudulent conveyance

claims against the Picower Defendants." *Id.* at 390.  The new complaint attempted to cure the

deficiencies in the previous complaint by "averring that the [Picower Parties'] fraudulent

withdrawals and fictitious entries in their own accounts had the effect of causing BLMIS to send

false financial statements to other customers." *Id.* at 392-93.  Aside from these conclusory

statements, the new Goldman complaint did not allege that the Picower defendants "directed or

were at all involved in the creation or dissemination of these statements to other BLMIS

customers," *Goldman I,* 2013 WL 5511027, at *8, or include particularized allegations that

Picower was an officer of BLMIS, or "that Picower Defendants did anything besides

fraudulently withdraw money from BLMIS and cause BLMIS to make phony entries in the

records of their accounts." *Goldman II*, 511 B.R. at 393.

---

[4]      In addition, the Fox/Marshall plaintiffs had moved to reopen their Florida action and for leave to file a
second amended complaint.  The Trustee also sought to enjoin the prosecution of that action.

E.    *Fox II*

The Goldman Parties did not ultimately pursue an appeal of this Court's *Goldman II*

decision,[5] but Fox/Marshall did.  District Judge Koeltl, who had also decided the prior

Fox/Marshall appeal, affirmed.  Like the Goldman Parties' complaints, Fox/Marshall's new

complaint included a claim under section 20(a) of the Exchange Act.  *Fox v. Picard* (*In re*

*BLMIS*), 531 B.R. 345, 349 (Bankr. S.D.N.Y. 2015) ("*Fox II*").  The Fox/Marshall section 20(a)

claim alleged, *inter alia*, that the Picower Parties "controlled BLMIS and participated in

convincing additional customers to invest in BLMIS by inducing BLMIS's misleading

statements to customers." *Id.* at 352.  Fox/Marshall sought to differentiate its allegations from

the Goldman Parties' initial control person allegations rejected in *Goldman I* by asserting that

their section 20(a) claims involved direct injuries based on their own reliance on fraudulent

statements and misrepresentations made to them.  *Id*.

The District Court reviewed the new complaint under the criteria discussed by the

District Court in *Goldman I,* and agreed that "the appellants have not made particularized

allegations about any misrepresentations made by the Picower parties or direct involvement of

the Picower parties in misrepresentations by Madoff." *Id.*  The Fox/Marshall complaint did not

point to any specific misrepresentations, and the allegations regarding "inflated account values,"

the only misrepresentations it discussed, were entirely conclusory.  *Id.*  In addition, the

allegations in the new Fox/Marshall complaint contained derivative allegations similar to those

rejected in *Goldman I*, and included actions taken by the Picower Parties regarding their own

---

[5]    The Goldman Parties' had filed a notice of appeal but stipulated to its dismissal.  (*See Harris Declaration*,
Exhibit 5.)

BLMIS accounts, particularized allegations of BLMIS' fraud that did not include the Picower

Parties, and conclusory allegations of control person liability with no particularized support.  *Id.*

The District Court concluded:

> [T]he appellants have merely repackaged the same facts underlying the Trustee's
> claims without any new particularized injuries of the appellants that are directly
> traceable to the Picower defendants.  Thus, all of the claims in the New Fox
> Complaint "impermissibly attempt to "plead around" the bankruptcy court's
> injunction barring all "derivative claims."

*Id.* at 354 (quoting *Marshall*, 740 F.3d at 96).


**F.    *Goldman III***

Against this history, the Goldman Parties filed their current class action complaint, dated

August 28, 2014 (the "*Complaint*"), in the Florida District Court.[6]  The *Complaint* contains many

of the same conclusory allegations in the *Goldman II* complaint (the "*Prior Complaint*").[7]  For

example, the *Prior Complaint* alleged that Picower controlled BLMIS based on (i) his close

business and social relationship with Madoff, (ii) his knowledge of the Ponzi scheme, (iii)

causing BLMIS to disseminate false and misleading financial information to its customers, (iv)

directing the recording of phony transactions, including backdated trades, in his own accounts,

and (v) his ability to obtain an improper $6 billion margin loan.  (*Prior Complaint* at ¶¶ 63-77.)

This Court held that those allegations were conclusory and based on activity in the Picower

Parties' own accounts.  *Goldman II*, 511 B.R. at 391-93.  Without the allegations regarding the

---

[6]      A copy of the *Complaint* is attached as Exhibit 1 to the *Harris Declaration*.

[7]      The *Prior Complaint* is attached to the *Declaration of Keith R. Murphy in Support of Application for Enforcement of the Permanent Injunction and Automatic Stay*, dated Nov. 17, 2014 ("*Murphy Declaration*") (Adv. Pro. No. 14-02407 ECF Doc. # 4) as Exhibit L.

Picower Parties' fraudulent withdrawals, "there [was] nothing left," thus the alleged injuries were "inseparable" from the Trustee's already settled fraudulent transfer claims. *Id.* at 393 (quoting *Marshall*, 740 F.3d at 92). Likewise, the *Complaint* includes conclusory allegations regarding Picower's[8] and Madoff's close relationship (*Complaint* at ¶¶ 5, 64, 117), Picower's knowledge of the Ponzi scheme, (*id.* at ¶¶ 64, 111), his ability to cause BLMIS to send false and misleading financial information to its customers, (*e.g., id.* at ¶¶ 1, 7, 10, 65, 74, 91-96), booking phony, back-dated transactions in his own accounts, (*id.* at ¶¶ 83-86), and the $6 billion margin loan for Defendant Decisions Incorporated stolen from the accounts of other BLMIS customers.[9] (*Id.* at ¶¶ 88-90.) These allegations suffer from the same deficiencies noted in *Goldman II.*

The Goldman Parties argue that the *Complaint* should nevertheless be spared the same fate as their prior pleadings based on the "Propping Up" and "Counterparty" Allegations. (*See Defendants' Objection to Application for Enforcement of Permanent Injunction and Automatic Stay*, dated Dec. 15, 2014 at 6 ("*Goldman Memo*") (Adv. Pro. No. 14-02407 ECF Doc. # 11).) The source of these new allegations appears to be "criminal proceedings against . . . other BLMIS employees, including without limitation the sworn testimony of Enrica Cotellessa-Pitz, Frank DiPascali, Jr., and Annette Bongiorno in the criminal action, *United States v. Bonventre, et al.,* 10-cr-228(LTS) (S.D.N.Y.)," as this is the only new source of information referred to in

---

[8]    The *Complaint* defines "Picower" as Jeffry Picower and affiliated defendants (*Complaint* at ¶ 1), and also alleges that the entity defendants were dominated, controlled and used as a mere instrumentality of Picower. (*Id.* at ¶ 42.) In this opinion, the Court will sometimes use "Picower" synonymously with the previously defined "Picower Parties."

[9]    Exhibit 7 annexed to the *Harris Declaration* includes a lengthy chart comparing the allegations in the *Complaint* with the allegations in the *Prior Complaint* and the *Trustee Complaint.*

15

the preamble to the *Complaint*.[10]  (*Compare Complaint,* at pp. 1-2 *with Prior Complaint,* at 1-2.)

### 1.      Propping Up Allegations

According to the *Complaint*, Picower "propped up" the Ponzi scheme by making two

loans to BLMIS, aggregating $200 million, and but for these loans, BLMIS would have been

unable to pay off redeeming investors and the Ponzi scheme would have collapsed.  (*Complaint*

at ¶ 67.)  There was no formal documentation pertaining to either loan, and it was essential to

keep them secret because the Financial Institution Regulatory Authority (FINRA) would have

had to approve the loans, and Picower would have had to sign agreements subordinating the

loans to certain other liabilities of BLMIS.  (*Id.* at ¶¶ 71-72.)

The first loan was made in 1992 or 1993.  Avellino & Bienes, a BLMIS feeder fund, had

failed and was under SEC investigation.  BLMIS needed cash to pay back Avellino's investors

---

[10]     As a consequence, the Picower Parties cited to portions of their testimony to show that the Propping Up and Counterparty Allegations actually relate to transactions in the Picower Parties' own accounts and/or that Madoff unilaterally inserted Picower's name as a counterparty.  The Goldman Parties objected contending that I am limited to the allegations in the *Complaint* as I would be on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*Goldman Memo* at 31.)

The Trustee and the Picower Parties are not seeking to dismiss the *Complaint*; they are seeking to enforce the Permanent Injunction and the automatic stay, and the Second Circuit has instructed me to inquire into the factual origins of the injury and the legal claims asserted in the *Complaint*.  *Marshall*, 740 F.3d at 89.  Although this does not mean that I should conduct a trial on the "control person" allegations to decide whether the Goldman Parties may proceed to trial on their "control person" claim in Florida, the inquiry identified by the Second Circuit nevertheless implies that I may consider facts outside the pleading in appropriate circumstances to determine the *bona fides* of the "control person" claim.  For example, if the Goldman Parties had attributed a statement of fact to a specific witness at the criminal trial, I would not have to blindly accept their characterization of that testimony and could review the transcript to determine whether the witness actually said what the Goldman Parties' claim he or she said.  *Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth . . . pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely.").

In light of the disposition of the applications, however, it is not necessary to consider the testimony in the criminal trial or determine the extent to which it would be appropriate to do so.

and deflect suspicion away from the Ponzi scheme.  After conferring with Madoff, Picower sent $76 million of securities from a non-BLMIS account to BLMIS "without consideration."  (*Id*. at ¶ 68.)  These securities were held in a BLMIS general account and pledged as security to obtain a bank loan (or loans) to repay Avellino clients.  (*Id*. at ¶ 69.)  The loan allowed BLMIS to perpetuate the fraud.  (*Id.*)

The second loan was made in April 2006.  Picower loaned $125 million, again "without consideration," to BLMIS when it was short on cash to pay redeeming customers.  Picower was "quickly" repaid the $125 million in September 2006.  (*Id*. at ¶ 70.)  Like the first loan, this loan was essential to perpetuate the Ponzi scheme.  (*Id.*)  Seventeen paragraphs later, however, the Goldman Parties indicate that the same loan was an investment in a Picower Party account.  The *Complaint* alleges that Defendant Decisions Incorporated opened a new account on April 24, 2006 with a wire transfer of $125 million.  (*Id*. at ¶ 87.)  The *Complaint* does not allege that the investment was withdrawn, but the *Trustee Complaint* alleged that the $125 million was withdrawn by Decisions Incorporated from its BLMIS account by means of a wire transfer on September 12, 2006.  (*Trustee Complaint* at ¶ 63(e), Ex. B, at 3.)  Although the *Complaint* alleges in conclusory fashion that the $125 million was a loan, the amount and the dates of deposit and withdrawal match the dates that Picower supposedly made the loan and received repayment.

Picower's bailouts gave him the power to coerce and control BLMIS because he could have refused to make the loans or call them and end the Ponzi scheme.  (*Complaint* at ¶¶ 67, 73.)  The same could be said of any lender or potential lender.

17

2.      **Counterparty Allegations**

Because BLMIS did not actually engage in any real stock or options trading, fabrication of the trading records was essential to the Ponzi scheme.  So too was the cooperation of partners in the fraud who agreed to act as counterparties to the phony options contracts with BLMIS.  (*Id.* at ¶¶ 76-77.)  Concerned that identifying institutional broker-dealers as counterparties would subject him to heightened scrutiny, Madoff believed BLMIS needed to frequently name new counterparties for its fake option trades.  (*Id.* at ¶ 78.)  BLMIS and Picower agreed that Picower would be listed as a counterparty for a large volume of BLMIS' phony options trades, and "Picower expressly agreed not to disclose the counterparty fraud and that he would warn Madoff if he was questioned by regulators or anyone else."  (*Id.* at ¶ 79.)  By agreeing to serve as a counterparty, Picower knowingly controlled the falsification of BLMIS' records and participated in their preparation and dissemination to induce customers to invest.  (*Id.* at ¶ 80.)

As the last sentence indicates, the thrust of the new allegations – like the allegations in the *Prior Complaint* – is that Picower controlled the falsification of BLMIS' financial records and participated in their preparation and dissemination to BLMIS' customers because he entered into transactions with BLMIS which caused BLMIS to prepare and disseminate false financial information.  The principal difference between the *Prior Complaint* and the current *Complaint* is that he was able to do this based on transactions that, at least according to the Goldman Parties, did not involve trading in the Picower Parties' accounts.[11]  Thus, the *Complaint* alleges that Picower directly caused BLMIS to disseminate material misrepresentations and omissions to

---

[11]      As noted, the $125 million loan was actually an investment.

18

BLMIS customers regarding the legitimacy and solvency of BLMIS, and BLMIS customers

relied on this information to invest in BLMIS and overpay for BLMIS securities and remain

invested in BLMIS.  (*Id.* at ¶¶ 74, 80, 95-96.)  Furthermore, Picower's ability to direct BLMIS

employees to create fictitious records relating to the propping up loans and fictitious options

trading allowed Picower to exercise control over the fictitious financial disclosures that BLMIS

made to FINRA in its Financial and Operational Combined Uniform Single ("FOCUS") reports.

(*Id.* at ¶¶ 91-94.)  Picower's fraudulent transactions as well as his fraudulent lending activity and

participation as a phony options counterparty all directly resulted in the falsification of BLMIS'

financial statements provided to regulators and relied upon by BLMIS customers.  (*Id.* at ¶ 91.)

The *Complaint* also continues to allege that Picower directed BLMIS to fabricate back

dated trades in the Picower accounts to carry out his fraudulent transfers and generate phony

profits.  (*Id.* at ¶¶ 82-83, 85-86.)  For example, on April 24, 2006, Defendant Decisions

Incorporated opened the "Decisions, Inc. 6" account with a wire transfer of $125 million.  (*Id.* at

¶ 87.)  Per Picower's directions, BLMIS employees fabricated back dated trades in the account to

January 2006, and also directed the preparation of false statements in May 2007 which reflected

millions of dollars of fictitious securities transactions that purportedly occurred in 2007.  (*Id.*)

Finally, Picower directed BLMIS to make a margin loan of approximately $6 billion to

Defendant Decisions Incorporated, even though the account had no trading activity or cash or

securities to support such borrowing and the loan violated margin rules established by the

Federal Reserve System and the New York Stock Exchange.  (*Id.* at ¶¶ 88-89.)  Picower knew

that the $6 billion credit was actually a transfer from the accounts of other customers that was

never recorded in those accounts.  (*Id.* at ¶ 90.)

19

### 3.      The Trustee's and the Picower Parties' Response

In response to the filing of the *Complaint*, the Trustee and the Picower Parties filed these

adversary proceedings.  They requested, *inter alia*, that the Court enforce the Permanent

Injunction and enjoin the *Complaint*.  (*See Memorandum of Law in Support of Application for*

*Enforcement of the Permanent Injunction and Automatic Stay*, dated Nov. 17, 2014 (Adv. Pro.

No. 14-02407 ECF Doc. # 3) ("*Trustee Memo*") and *Memorandum of Law in Support of*

*Plaintiffs' Application for Enforcement of the Permanent Injunction*, dated Nov. 17, 2014 (Adv.

Pro. No. 14-02408 ECF Doc. #3) ("*Picower Memo*").)

The Trustee argued that the Propping Up Allegations were derivative because they

merely put a different spin on a backdating allegation in the *Trustee Complaint* and rehashed

arguments made in the Trustee's litigation that Picower bolstered the Ponzi scheme.  (*Trustee*

*Memo* at 26-29.)  The Counterparty Allegations were conclusory and asserted "general" claims

barred by the Permanent Injunction.  (*Id*. at 29-33.)  The Trustee also accused the Goldman

Parties of attempting to create and recover from a "shadow estate" in contravention of the

Second Circuit's decision in *In re BLMIS*, 654 F.3d 229, 242 (2d Cir. 2011), *cert. denied*, 133 S.

Ct. 24 (2012) which limited customer recovery to the amount deposited into a BLMIS account

less amounts withdrawn, *i.e.* the customer's "net equity."  (*Trustee Memo* at 33-34.)  Finally, the

Trustee argued that the *Complaint* was barred by the automatic stay and certain stay orders

issued by the District Court on December 15 and 18, 2008 and February 9, 2009.  (*Id.* at 34-37.)

The Picower Parties also argued that the new Propping Up Allegations and Counterparty

Allegations were derivative of the Trustee's fraudulent transfer claims because they (1) relate

exclusively to activity in the Picower Parties' own BLMIS accounts, (2) were conclusory and

non-particularized, (3) were contradicted by the documents incorporated by reference in the

*Complaint*, (4) did not give rise to a *bona fide* securities fraud claim, and (5) were general claims

that could be asserted by every BLMIS customer.  (*Picower Memo* at 22-36.)  The Picower

Parties further requested that the Court permanently enjoin the Goldman Parties from filing any

more complaints against them.[12]  (*Id.* at 38-39.)

The Goldman Parties opposed the applications.  (*See Goldman Memo.*)[13]  They asserted

that the *Complaint* cured the infirmities cited by the prior court decisions "because it alleges that

Picower engaged in wrongful conduct that was entirely independent of any fraudulent

withdrawal from his own accounts or the documentation thereof."  (*Id.* at 2.)  Rather, the basis

for the new allegations included testimony adduced during a criminal trial of certain BLMIS

employees that was previously unavailable.  (*Id.*)  Accordingly, the *Complaint* alleges

---

[12]     The Picower Parties first requested a much broader injunction.  Their request was modified to the present
version in the order denying the Goldman Parties' motion to dismiss their complaint.  (*See Order Regarding Motion
to Dismiss Complaint*, dated Feb. 13, 2015 ("*Order Denying Dismissal*") (Adv. Pro. No. 14-02407 ECF Doc. # 34)
("ORDERED that Count Two of the Complaint shall be amended to reflect only a request to deny the Goldman
Parties leave to re-plead any complaint against the Picower Parties in the event that the Court determines that the
Goldman Parties are enjoined from proceeding with the action captioned *Goldman v. Capital Growth Co., et al.*,
Case No. 09:14cv-81125-KAM (S.D. Fla.)".)

[13]     While the *Goldman Memo* addressed the substance of the *Trustee Memo* and *Picower Memo*, the Goldman
Parties also filed a separate response in the adversary proceeding initiated by the Picower Parties.  (*See Defendants'
Response and Objection to Picower Parties' Application for Enforcement of Permanent Injunction*, dated Dec. 15,
2014 ("*Goldman Other Memo*") (Adv. Pro. No. 14-02408 ECF Doc. # 15).)  In that response, the Goldman Parties
argued that the Picower Parties were improperly pursuing an adversary proceeding separate from the Trustee's
adversary proceeding, (*id.* at ¶¶ 2-9), and previewed the Goldman Parties' challenge to the Picower Parties'
standing.  (*Id.* at ¶ 10.)  The issues presented by the *Goldman Other Memo* were rendered moot or resolved through
the Court's entry of orders consolidating the Trustee's and the Picower Parties' adversary proceedings (*see Order
Consolidating Adversary Proceeding*, dated Dec. 23, 2014 (Adv. Pro. No. 14-02407 ECF Doc. # 15)), and denying
the Goldman Parties' motion to dismiss the Picower Parties' complaint for lack of standing.  (*See Order Denying
Dismissal*.)

particularized, *bona fide* control person claims under section 20(a) of the Exchange Act, which

the Trustee did not, and could not, assert.

The Trustee and Picower Parties each replied to the *Goldman Memo*. (*See Trustee's*

*Reply Memorandum in Support of Enforcement of Permanent Injunction and Automatic Stay*,

dated Jan. 12, 2015 ("*Trustee Reply*") (Adv. Pro. No. 14-02407 ECF Doc. # 21) and *The Picower*

*Parties' Reply Brief in Further Support of Their Application for Enforcement of the Permanent*

*Injunction*, dated Jan. 12, 2015 ("*Picower Reply*") (Adv. Pro. No. 14-02407 ECF Doc. # 22).)

The *Trustee Reply* contended that the Court should not rule on whether the Trustee had standing

to bring a hypothetical claim against the Picower Parties based on the Propping Up and

Counterparty Allegations, but in any case, *in pari delicto* did not apply because the *Complaint*

alleged that Picower was an insider of BLMIS. (*Trustee Reply* at 4-7.) The Trustee also

reiterated that the *Complaint*'s allegations are derivative because they are based on purported

trading activity in Picower's own accounts. (*Id*. at 11-14.) The *Picower Reply* similarly argued

that derivative claims were not limited just to withdrawals from Picower's accounts, (*Picower*

*Reply* at 10-13), and added that the Propping Up and Counterparty Allegations did not give rise

to *bona fide* control person claims. (*Id*. at 16-18.)

The Goldman Parties submitted a sur-reply to the *Trustee Reply*. They argued that

Picower was not a "corporate insider" and *in pari delicto* applied, (*see Defendants' Sur-Reply in*

*Opposition to Application for Enforcement of Permanent Injunction and Automatic Stay*, dated

Jan. 23, 2015 ("*Goldman Sur-reply*"), at 2-5 (Adv. Pro. No. 14-02407 ECF Doc. # 25)), and they

had standing to bring the control person claim as purchasers of securities under the Exchange

Act. (*Id*. at 5-6.) The Trustee filed a letter (*see Letter*, dated Jan. 28, 2015 (Adv. Pro. No. 14-

02407 ECF Doc. # 26)) requesting that the Court either strike the unauthorized *Goldman Sur-reply* or permit the Trustee's brief response set forth in the letter.  In this instance, the Court will allow both the *Goldman Sur-reply* and the Trustee's subsequent letter.  They address issues pertinent to the instant matter, and no party is prejudiced since both were able to fully brief the merits.

After the Court heard oral argument on February 5, 2015, the Trustee provided the Court with a copy of District Judge Koeltl's decision in *Fox II* as supplemental authority, (*see Letter*, dated May 12, 2015 (Adv. Pro. No. 14-02407 ECF Doc. # 36)), and the Goldman Parties responded, (*see Goldman Plaintiffs' Response to Letter Regarding Supplemental Authority*, dated June 23, 2015 (ECF Doc. # 38)), distinguishing the *Complaint* from the Fox/Marshall complaint that Judge Koeltl's decision addressed.

## DISCUSSION

### A.    Introduction

The question before the Court is whether the *Complaint* asserts a *bona fide* section 20(a) claim,[14] or instead, a claim that is derivative or duplicative of the claims asserted or that could have been asserted by the Trustee against the Picower Parties.  Derivative claims "arise from harm done to the estate[,] seek relief against third parties that pushed the debtor into

---

[14]     A "control person" claim under § 20(a) of the Exchange Act requires proof that (1) BLMIS committed a primary violation of the securities laws, (2) Picower had the power to control the business affairs of BLMIS, and (3) and Picower "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quoting *Theoharous v. Fong,* 256 F.3d 1219, 1227 (11th Cir. 2001)) (quotation marks omitted); *accord Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396-97 (11th Cir. 1996), *cert. denied*, 519 U.S. 1112 (1997).

bankruptcy," are "based upon a secondary effect from harm done to the debtor," *Marshall*, 740 F.3d at 89 (internal quotation marks and alterations omitted), and are characterized by wrongful acts that harmed every BLMIS investor in the same way.   *Fox I*, 848 F. Supp. 2d. at 480.   Non-derivative claims arise from an injury that "can be directly traced to the third party's conduct." *Marshall*, 740 F.3d at 89 (quotation and alternation omitted).   "Although the same factual allegations may give rise to both derivative and independent claims, [creditors] may not state independent claims merely by asserting new legal claims or seeking different forms of relief than the Trustee." *Fox II*, 531 B.R. at 351, 352-53 (citing *Marshall*, 740 F.3d at 91-93).   "In assessing whether a claim is derivative, [the court must] inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted."   *Marshall*, 740 F.3d at 89.   The inquiry is necessary to prevent a party from concocting a claim based on conclusory allegations of direct injury that would render the Permanent Injunction and the automatic stay toothless protections and discourage future settlements.

The Court's inquiry overlaps to some extent with the legal sufficiency of the *Complaint* although the inquiries are not the same.   The Court is not deciding whether the *Complaint* should survive a motion to dismiss under Federal Civil Rule 12(b)(6).[15]   Instead, it must determine whether the particularized factual allegations in the *Complaint* assert a claim that is derivative or duplicative of the Trustee's fraudulent transfer claims against the Picower Parties under the criteria discussed above.   That determination is informed by the prior decisions of this Court, the District Court and the Second Circuit, and not by the label the Goldman Parties attached to their

---

[15]     The parties have briefed the question of whether the *Complaint* states a legally sufficient "control person" claim, but the Court does not decide that issue.

24

claim.  If the claim is direct, the legal sufficiency of the *Complaint* must be decided by the
Florida District Court.

**B.      The *Complaint***

Notwithstanding its frequent invocation of the word "control," the gravamen of the
*Complaint* is that Madoff and Picower were partners in a fifteen-year conspiracy to perpetuate
the Ponzi scheme in order to allow Picower to profit while BLMIS was driven deeper into
insolvency.  The *Complaint* avers that Picower and Madoff were the masterminds of the
fraudulent scheme, (*Complaint* at ¶ 110), partners in crime, (*id.*), *de facto* partners, (*id.* at ¶¶ 5,
64), and according to Madoff, Picower was complicit in the scheme.  (*Id.* at ¶ 65.)  Picower
"became a control person of BLMIS for his own benefit," (*id.*), and had motive and opportunity
to control BLMIS because his control enabled him to steal at least $7.2 billion in cash invested in
BLMIS.  (*Id.* at ¶ 8.)  The Picower Parties "profited from the BLMIS scheme, and did in fact
materially benefit from Picower's direct or  indirect control of BLMIS."  (*Id.* at ¶ 119.)

The "propping up" loans were essential to the Ponzi scheme because "[b]ut for these
'loans,' BLMIS would have been unable to pay off redeeming investors and the Ponzi scheme
would have collapsed."  (*Complaint* at ¶ 67; *see id.* at ¶ 10.)  By the same token, the fabrication
of the counterparty trading record was critical to Madoff's illusory split-strike options trading
strategy, (*id.* at ¶ 11), and "essential" to the Ponzi scheme.  (*Id.* at ¶¶ 79-80.)  In short, the
propping up loans, the counterparty conspiracy and everything else the *Complaint* alleges
Picower did were incident to the fraudulent withdrawals of $7.2 billion.  *See Goldman I*, 2013
WL 5511027, at *9.

25

Furthermore, the propping up loans and counterparty fraud injured the BLMIS estate and indirectly affected all creditors in the same way. The propping up loans rendered BLMIS insolvent,[16] (*Complaint* at ¶ 74), and BLMIS' inability to satisfy its investors' redemption calls ultimately drove BLMIS into bankruptcy. *See Diana Melton Trust v. Picard* (*In re BLMIS*), 15 Civ. 1151 (PAE), 2016 WL 183492, at *3 (S.D.N.Y. Jan. 14, 2016) ("In 2008, Madoff's scheme collapsed, when the money coming in from new investments no longer could support the redemptions sought by his customers.") (citing *In re BLMIS*, 654 F.3d at 232). Similarly, the fictitious option trading records allowed the scheme to continue driving BLMIS deeper into insolvency.

The *Complaint* attempts to divorce the section 20(a) claim from the Trustee's claims contending that the Propping Up and Counterparty Allegations do not relate to the Picower Parties' own accounts, (*Complaint* at ¶ 81), a proposition that the Picower Parties and the Trustee dispute.[17] In truth, however, the *Complaint* alleges "nothing more than steps necessary to effect

---

[16]       The Complaint alleges that the loans rendered BLMIS insolvent "because they created a $200 million liability without any corresponding asset." (*Complaint* at ¶ 74.) This conclusory allegation makes no sense. "It was essential to the scheme that BLMIS appear to be a solvent, profitable brokerage firm." (*Id.* at ¶ 44.) The loans would not have "propped up" BLMIS if they had not ostensibly increased BLMIS' assets by $200 million. Moreover, the *Complaint* also alleges that both loans were made "without consideration." (*Id.* at ¶¶ 68, 70.) Obviously, the $200 million was consideration to BLMIS. If "without consideration" means the loans were gifts from Picower (although the *Complaint* alleges the repayment of the $125 million "loan"), they would not have created a $200 million liability.

[17]       The parties disagree about whether a claim is derivative only if it is based on Picower Parties' fraudulent withdrawals, or more generally, if it is based on transactions in the Picower Parties' accounts. The prior decisions can be read to support the latter position. *E.g.*, *Marshall*, 740 F.3d at 92 ("The ... Complaints plead nothing more than that the Picower Defendants traded on their *own* BLMIS accounts, knowing that such 'trades' were fraudulent, and then withdrew the 'proceeds' of such falsified transactions from BLMIS. All the 'book entries' and 'fraudulent trading records' that the Complaints allege refer to nothing more than the fictitious records BLMIS made, *for the Picower Defendants,* to document these fictitious transactions.") (quoting *Goldman I*, 2013 WL 5511027, at *7) (emphasis in original).

The Court believes that the prior decisions should be read, *inter alia*, to foreclose any claims based on transactions in the Picower accounts. First, the prior Goldman Parties' and Fox/Marshall complaints, like the

the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of

'particularized' conduct directed at BLMIS customers." *Marshall*, 740 F.3d at 84.  The Goldman

Parties allege that Picower controlled BLMIS to perpetuate the Ponzi scheme so that he could

steal $7.2 billion through the fraudulent withdrawals from the Picower Parties' accounts – the

very claim the Trustee settled and conduct that harmed all creditors in the same manner.  (*See id.*

at ¶ 8 ("Picower had both the motive and opportunity to control BLMIS.  He stole at least $7.2

million (40%) of the total $18 billion in cash invested in BLMIS.").)  Moreover, every investor

could assert the same claim.  *See Fox I*, 848 F. Supp.2d at 480 ("[I]t is plain that every BLMIS

customer suffered the same types of damages asserted by the Appellants in the Florida

Actions.").

Although the *Complaint* tries to tie Picower's transactions to BLMIS' misrepresentations

to its customers – the primary violation – the "linking" allegations are entirely conclusory, and

are based on the effect that Picower's activities, whether loans, fictitious option trades or

fraudulent trading in the Picower accounts, supposedly had on the financial information that

BLMIS sent to its customers.  They include the following:

- • "Picower caused the dissemination of material misrepresentations and documents containing material omissions relied on by BLMIS customers that are the basis of BLMIS' securities law violations."  (*Id* at ¶ 7.)

- • "Picower directed BLMIS on strategic decisions regarding the dissemination of such misrepresentations and omissions and participated directly in the scheme

---

*Complaint*, relied on the fictitious entries in the Picower accounts, and those entries included the allocation of fictitious profits that were not necessarily withdrawn from the accounts.  In fact, the Picower Parties had filed twenty-one claims against the SIPA estate, which they withdrew under the Settlement Agreement.  Second, the Picower Parties' deposits constituted "value" under 11 U.S.C. § 548(c), and would have been integral to their defense had the Trustee's fraudulent transfer action gone forward.  Instead, the Trustee's claims (and hence, the Picower Parties' defenses) were wrapped up in the parties' settlement pursuant to which the Picower Parties' repaid their fictitious profits (withdrawals minus deposits).

and its concealment." (*Id.* at ¶ 9.)

• "Picower caused and directed material misrepresentations and omissions relating to BLMIS' general trading activity, balance sheet, assets, capital, and solvency, all of which gave investors and regulators the false appearance that BLMIS was engaged in profitable and legitimate trading and investment activity, and all of which induced Plaintiffs and the class members to invest or remain invested in BLMIS." (*Id.* at ¶ 12.)

• "Picower had invested in BLMIS since the 1980s, and he became a control person of BLMIS for his own benefit at least by December 1, 1995, when he started to directly or indirectly cause BLMIS to make misrepresentations to other customers, and to direct and participate in the fraudulent acts described herein." (*Id.* at ¶ 65.)

• "Picower secretly financed the Ponzi scheme and directly participated in BLMIS' fraudulent transactions that allowed the Ponzi scheme to go undetected by regulators and the class members, and he caused the dissemination of highly material misstatements and omissions in BLMIS' financials for extended periods of time." (*Id* at ¶ 66.)

• "Through these secret and illegal 'loans' to BLMIS, Picower directly caused the dissemination of material misrepresentations and omissions to prospective and existing BLMIS customers about the legitimacy and solvency of BLMIS, which BLMIS customers relied upon in investing with, or staying invested with, BLMIS." (*Id* at ¶ 74.)

• "By agreeing to act as a party to fraudulent options transactions, Picower knowingly controlled the falsification of the books of BLMIS and participated in the preparation and dissemination of false information and material omissions about the legitimacy of the split-strike options strategy used to induce BLMIS customers to invest." (*Id.* at ¶ 80.)

• "Picower's ability to direct the creation and dissemination of false and misleading trading and financial documentation which he knew would be incorporated in financial disclosures made by BLMIS, establishes that Picower exercised direct and indirect control over the day-to-day operations of BLMIS and specifically over the activity that constituted a violation of the securities laws." (*Id.* at ¶ 94.)

• "Picower's direction of fraud with respect to his own accounts, and the financial and trading records of BLMIS, coupled with his knowledge and intent that BLMIS would necessarily create corresponding false entries in other BLMIS customer accounts, show control of the specific fraudulent activity which constituted the underlying Ponzi scheme and the underlying violations of Section 10(b) and Rule 10b-5 engaged in by BLMIS." (*Id.* at ¶ 96.)

28

• "Picower is responsible for the entire $11 billion loss as a control person who participated in and caused the dissemination of material misrepresentations and omissions and directed the fraudulent scheme."  (*Id.* at ¶ 99.)

• "Picower directly or indirectly induced and participated in BLMIS' misleading statements to others.  These misrepresentations induced BLMIS customers to pay BLMIS for non-existent securities."  (*Id.* at ¶ 117.)

• "Picower had intimate knowledge of and involvement in the operations, record keeping, and financial management of BLMIS.  Picower directly or indirectly induced the material misrepresentations, fraudulent schemes and omissions giving rise to the securities violations alleged herein."  (*Id.* at ¶ 118.)

• "Picower knew and intended that the material misrepresentations and omissions described herein would be communicated to other investors, including Plaintiffs and knew that they would be defrauded by BLMIS' fraudulent schemes. Picower directly or indirectly induced BLMIS to conceal the fraud from BLMIS customers and regulators."  (*Id.* at ¶ 119.)

• "Picower directed and was involved in the creation and dissemination of actionable misrepresentations and omissions to prospective and existing BLMIS customers, which representations and omissions were not incident to the Picower's fraudulent withdraws [*sic*] from Picower's BLMIS accounts."  (*Id.* at ¶ 122.)

The allegations that Picower's transactions with BLMIS were reflected in or affected the financial information that BLMIS sent to its customers, or influenced their decisions to invest or stay invested in BLMIS, are wholly conclusory.[18]  The *Complaint* does not include any particularized allegation that Picower ever prepared a BLMIS record or told Madoff what information to put into the financial information that BLMIS sent to its customers, that he sent or participated in the transmission of such a statement by BLMIS to a customer, that he interacted with any customer or that any BLMIS customer relied on any such information.  The Goldman

---

[18]    The suggestion that Picower's transactions had any effect on BLMIS' financial reporting ignores Madoff's penchant for financial fiction, and assumes that transactions in which Picower participated affected the false information that Madoff randomly decided to put into the other customers' monthly statements.

Parties have certainly not pointed to any instance in which they received or relied on Picower-tainted information.  Moreover, the only particularized allegations – that Picower gave express directions to BLMIS employees concerning certain specific transactions, (*see id.* at ¶¶ 85-89) – relate to transactions in the Picower Parties' own accounts, and have been rejected as the basis for a *bona fide* section 20(a) claim.  *See Goldman I*, 2013 WL 5511027, at *6-7.  In short, the *Complaint* does not allege that the Picower Parties "directed or were at all involved in the creation or dissemination of these statements to other BLMIS customers."  *Goldman II*, 511 B.R. at 393 (quoting *Goldman I,* 2013 WL 5511027, at *8) ("[B]eyond conclusory statements that the Picower Defendants' fraudulent transactions relating to their own accounts caused BLMIS to send false statements to other customers, the new Goldman complaint did not allege that the Picower Defendants "directed or were at all involved in the creation or dissemination of these statements to other BLMIS customers.").

In the end, the Goldman Parties allege that the Picower Parties made two loans, one in 1992 or 1993 in the sum of $76 million, (*see Complaint* at ¶¶ 68, 70), which was possibly more than two years before he became an alleged control person, (*id.* at ¶ 65) ("Picower . . . became a control person of BLMIS . . . at least by December 1, 1995), and another $125 million "loan" in 2006 that was actually an investment and withdrawal that formed part of the Trustee's fraudulent transfer claim.  In addition, the *Complaint* alleges that Picower allowed Madoff to list him as a counterparty on phony option transactions and not tell anyone, but doesn't say when this occurred, how often it occurred, whether Picower lied to anyone about the option trades or whether the phony counterparty information was ever shared with any customer.  The essence of the *Complaint*, like the Goldman Parties' prior pleadings, is that Picower stole $7.2 billion from

BLMIS, a claim common to all customers.

Finally, *Picard v. JPMorgan Chase & Co.*, (*In re BLMIS*), 721 F.3d 54 (2d Cir. 2013),

*cert. denied*, 134 S. Ct. 2895 (2014), which the Goldman Parties cite in support of their

contention that their section 20(a) claim is direct, is distinguishable.  There, the Trustee asserted

common law claims in the nature of aiding and abetting Madoff's fraud against several banks

and other financial entities.  Two District Courts concluded that the Trustee lacked standing to

assert the common law claims, *id.* at 62, and the Second Circuit affirmed.  The Court of Appeals

explained that under the principles of *in pari delicto* and the rule established in *Shearson Lehman*

*Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991), the common law claims belonged to

the BLMIS creditors and not the estate.  *JPMorgan Chase*, 721 F.3d at 63-65.  Furthermore, the

Trustee could not assert the creditors' claims because they were not general to all creditors.  A

claim was general and belonged to the estate if it sought to augment the fund of customer

property and affected all creditors in the same way.  The Trustee, however, was trying to assert

claims on behalf of thousands of customers against financial institutions for their handling of

individual investments made on various dates and in varying amounts that could not have

harmed all customers in the same way.  *Id.* at 71.[19]

---

[19]      The Second Circuit's description of general claims tracks District Judge McMahon's discussion of the
same point, *see Picard v. JPMorgan Chase Co.*, 460 B.R. 84, 96 (S.D.N.Y. 2011), and the Goldman Parties'
memorandum includes a lengthy quote from that decision.  (*Goldman Memo* at 25.)  Judge McMahon stated that the
Trustee's common law claims were not estate claims, *inter alia*, because any recovery would not accrue to the
benefit of all creditors, at least not in the same way.  *Id.*  Net losers would benefit to the exclusion of net winners
because the recovery would go into the customer property estate.  *Picard v. JPMorgan Chase*, 460 B.R. at 96.  The
same could be said, however, of the Trustee's fraudulent transfer recoveries; they become part of the customer
property estate, SIPA § 78fff-2(c)(3), and likewise inure to the benefit of the net losers who have net equity claims,
but not to net winners unless the customer property estate becomes solvent.

Plainly, the Trustee does not have standing to assert the customers' section 20(a) and common law claims. That, however is not the issue. The Trustee and the Picower Parties have not asserted any claims; they are seeking to enforce the Permanent Injunction and the automatic stay, and the question is whether the *Complaint* violates that Permanent Injunction and the automatic stay under the rules laid out in the prior decisions regarding the Goldman Parties and Fox/Marshall complaints.

District Court Judge Koeltl discussed this distinction in *Fox I* and rejected a similar challenge. There, the appellants also argued that *in pari delicto* and the *Wagoner* Rule barred the Trustee from asserting the claims brought by Fox/Marshall in Florida, and hence, the claims belonged to the proposed customer class. *Fox I*, 848 F. Supp. 2d at 483. The District Court observed that this argument would require a significant expansion of the *Wagoner* Rule which has only been applied to claims brought by the Trustee. *Id.* at 484. Thus,

> Even if the Trustee might be barred from asserting the claims against the Picower defendants in the Florida Actions in the exact form in which the Appellants have pleaded them, that fact cannot be dispositive of the question of whether the Florida Actions are covered by the automatic stay. To apply *Wagoner* here, where the Trustee did not bring the Florida Actions, would perversely require ruling on a hypothetical controversy over the Trustee's standing to bring an action that the Trustee never brought when the Trustee had the right and the standing to bring the New York Action alleging fraudulent conveyances and when the Florida Actions are an end run around the New York Action.

*Id.* at 484-85. In a nutshell,

> The Appellants seek to invalidate the Bankruptcy Court's orders based on a hypothetical claim that the Trustee did not bring and based on a hypothetical defense that the Picower defendants did not assert in the hypothetical lawsuit. The Appellants cannot defeat the straightforward fact that their lawsuits were duplicative of the New York Action that the Trustee had the right to bring.

32

*Id.* at 485; *accord Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, No. 14 Civ. 8623
(PAE), 2015 WL 4635630, at *13 (S.D.N.Y. Aug. 4, 2015).

Here too, and unlike *J.P. Morgan Chase*, the Trustee is not asserting a common law or
control person claim; the Goldman Parties' are. Neither *in pari delicto* nor the *Wagoner* Rule
bar the Trustee from seeking to enforce the Permanent Injunction or the automatic stay.

Furthermore, the Goldman Parties' "control person" claim, in reality, seeks to augment a
"shadow estate" that will benefit all net losers in the same way. By the time BLMIS collapsed,
almost $20 billion of principal was lost, and of that amount, approximately $17.5 billion was lost
by those who filed claims. *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 453 (Bankr. S.D.N.Y.
2015). The *Complaint* alleges that "Picower is responsible for *all* $18 billion of the losses
suffered by BLMIS customers," (*Complaint at ¶* 13; *accord id.* ¶ 120)*,* and seeks to recover that
amount, less the $7.2 billion the Picower Parties paid in the settlement with the Trustee and the
Government, for the benefit of the class. (*See id.* at ¶ 99.) This "shadow estate" will supplement
the customer property estate to the extent it is insufficient to pay all net equity claims in full, and
every net loser can assert the same claim. Judge Koeltl's admonition in *Fox I* remains equally
applicable today:

> Allowing the Florida Actions to go forward would carry real risks to the estate,
> implicating the viability of the current settlement and the possibility of future
> settlements, and providing an avenue for BLMIS customers who are displeased
> with the Net Equity Decision to undermine that decision by directly pursuing
> claims that are wholly derivative of claims already brought by the Trustee.

*Fox I*, 848 F. Supp. 2d at 490–91.

33

Accordingly, the Court concludes that the section 20(a) claim asserted in the *Complaint* is

barred by the Permanent Injunction.  In light of this conclusion, the Court does not reach the

issue of whether the claim is also barred by the automatic stay.

## C.    Future Proceedings

Count II of the Picower Parties' complaint, as modified by the *Order Denying Dismissal*,

seeks "to deny the Goldman Parties leave to re-plead any complaint against the Picower Parties"

should the Court determine that the Goldman Parties' *Complaint* is enjoined by the Permanent

Injunction.  (*Order Denying Dismissal* at 2.)  The Goldman Parties have not, however, filed a

pleading in this Court and have not indicated an intention to do so.  Rather, the question posed by

the Picower Parties' Count II is whether the Goldman Parties should be permanently barred from

filing any more complaints against them in the Florida District Court or anywhere else.

"A district court may, in its discretion, impose sanctions against litigants who abuse the

judicial process." *Iwachiw v. N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir.

2005) (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir.1996)).  The Second

Circuit has previously set forth the factors to consider when restricting a party's access to courts:

> (1) the litigant's history of litigation and in particular whether it
> entailed vexatious, harassing or duplicative lawsuits; (2) the
> litigant's motive in pursuing the litigation, e.g., does the litigant
> have an objective good faith expectation of prevailing?; (3)
> whether the litigant is represented by counsel; (4) whether the
> litigant has caused needless expense to other parties or has posed
> an unnecessary burden on the courts and their personnel; and (5)
> whether other sanctions would be adequate to protect the courts
> and other parties.

*Iwachiw*, 396 F.3d at 528 (quoting *Safir v. United States Lines, Inc.*, 792 F.2d 19, 24 (2d

Cir.1986), *cert. denied*, 479 U.S. 1099 (1987)).  Further, a court may adopt the "less dramatic

34

remedy" of subjecting a litigant to a "leave of court" requirement for future filings.  *In re Martin-Trigona*, 9 F.3d 226, 229 (2d Cir. 1993).

While the question is close, I decline to impose an absolute ban on the Goldman Parties at this time.  The history of their litigation against the Picower Parties is neither harassing nor vexatious.  They have filed only three lawsuits, far fewer than the levels previously found by this Circuit to justify injunctive relief in such circumstances.  *See, e.g. Safir,* 792 F.2d at 23–24 (11 lawsuits); *Iwachiw,* 396 F.3d 525 at 528-29 (over 15 lawsuits); *Martin-Trigona v. Lavien* (*In re Martin-Trigona*), 737 F.2d 1254, 1259 (2d Cir. 1984) (over 250 civil actions), *cert. denied*, 474 U.S. 1061 (1986).  In addition, the Court does not question the Goldman Parties' motives or good faith.  Their clients and the putative class lost money in Madoff's Ponzi scheme, and I cannot say that their "control person" claims are frivolous.  For this reason, I reject the Picower Parties suggestion that sanctions under 28 U.S.C. § 1927 may be appropriate.  (*See Picower Parties' Memorandum of Law in Opposition to Goldman Parties' Motion to Dismiss Complaint,* dated Jan. 29, 2015 at 20 ("*Picower Dismissal Memo*") (Adv. Pro. No. 14-02407 ECF Doc. # 27).)

On the other hand, the Goldman Parties' efforts to sue the Picower Parties have resulted in largely duplicative pleadings, caused enormous expense to the Trustee and the Picower Parties (judging from the quantity and breadth of their submissions), and time-consuming to all including the Court.  The Goldman Parties' first complaint parroted the *Trustee Complaint* and the first Fox/Marshall complaint, *SIPC v. BLMIS*, 477 B.R. at 358, Exhibit A, and was derivative because it re-pleaded the Trustee's fraudulent transfer claims.  *Goldman I*, 2013 WL 5511027, at *10.  Their second complaint was also derivative because its "new" allegations were entirely

conclusory.  *Goldman II*, 511 B.R. at 393.  The *Complaint*, their third try, suffers from the defects noted above.

With each iteration, the Picower Parties and the Trustee have been forced to expend substantial resources.  Just with this *Complaint*, the Picower Parties and/or the Trustee had to (1) defend against the Goldman Parties' motion to withdraw the reference of the Trustee's complaint (which motion was withdrawn one day after the Trustee submitted his opposition to the motion), (2) litigate a motion to consolidate the Trustee's and Picower Parties' adversary proceedings, and (3) defend against a frivolous motion to dismiss the Picower Parties' complaint.  (*Picower Dismissal Memo* at 20-26.)  Moreover, this Court has now issued three lengthy decisions, and the District Court has issued one decision, enjoining the Goldman Parties' complaints.

On balance, I nevertheless decline to impose an injunction, at least for now, in part because the Goldman Parties have never actually proceeded with their "control person" claim without the leave of this Court.  This Court has acted as the gatekeeper of their claims, either by agreement of the parties or order of the Florida District Court, and the remedy is "less dramatic" than an outright ban, for now, on further filings.  The gatekeeping function has been expensive and time-consuming, but the Court is confident that the Goldman Parties will not cause any further needless expenditure of resources or time.  The Trustee or the Picower Parties, or both, may seek appropriate sanctions if they do.

The Court has considered the other arguments made by the parties and concludes that

they lack merit or are rendered moot by the Court's determination.  Settle order on notice.


Dated: New York, New York
       February 17, 2016


                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                              United States Bankruptcy Judge